Thank you. Please be seated. The first case on our docket this morning is 22-50315, Abdulla v. Paxton. Ms. Jump. Thank you. May it please the court. My name is Kristina Jump and I am here today along with co-counsel Chelsea Glover on behalf of Appellant Hasib Abdulla. And I would like to reserve five minutes, which I believe is already set aside. Mr. Abdulla is vested in his retirement benefits through two different funds, through his work as a public employee. Both of those are governed by Texas Government Code Section 808. That statute requires that the fiduciaries place political views as determined by the state of Texas ahead of the financial considerations in governing the funds and making investments with those funds. Mr. Abdulla challenges the statute as unconstitutional in violating the First Amendment's free speech and establishment clauses, as well as 14th Amendment due process. The district court erred in holding that he did not have standing and held him to an improperly heightened burden, which was not applicable at the pleading stage. The district court dismissed solely on the finding of lack of standing and we challenge that here today. What is your best case site for the proposition that he is actually impacted by this? Not personally. I'm sure it upsets him, and that's fine. But in terms of his actual pension, what he actually receives, how is he impacted, and what case site would support that notion? Your Honor, I would begin, first of all, by saying that under the Supreme Court's holding in TransUnion v. Ramirez most recently, which is 141 Supreme Court 2190, in that case, Justice Abdulla did not be considered appropriate standing in hypotheticals, such as a mainlander complaining about pollution in Hawaii in a different state, a person who drove on a road and an accident happened at an intersection after that person already passed. And that's not the situation that we have here. The situation that we have here with Mr. Abdulla is these are his funds. This is his money that he has put in. And while we are not claiming, as I believe my colleague across the aisle had briefed in response, we are not claiming that he has a vested right in any one particular asset at this moment. But we are saying that that is it. He does have a property right in his vested interest in what happens with the funds. And in addition, as it is a constitutional violation that is alleged and a facial challenge to the unconstitutionality of it, under this Court's holding in OCA v. Greater Houston v. Texas, 867 F. 3rd 604, under that holding, this is directly traceable. Again, it's an injury to him and to his rights as a vested person interested. He's not a bystander. I'm trying to understand, like, is he going to get a different amount of money if they don't? Your Honor, I would say that the specific answers to the amount of money is something that would be more subject to, more appropriate for discovery. What he alleges, he gives one example of a divestment that is in the pleading or in his complaints, but then states again that the fact that the motivation here is to put the political views as Texas sees them and judgment ahead of the fiduciary responsibilities is what is causing the constitutional harm. And in causing the constitutional harm— Are you saying there is no injury, there's some constitutional harm? No, I'm saying that, I'm saying he does have an injury, but that we don't— What is his injury? His injury, I believe that his injury is the fact that the motivations and the direction given to the fiduciaries of these funds is that they have to prioritize the political determinations made by the state of Texas and made by the list that the comptroller creates in order to make the, in order to be the caretakers of these funds. And so his money is not being properly handled. His money is being subjected to a political determination— But back to what Judge Haynes said, how does that impact the amount of money he is entitled to receive when he retires? When he retires, both of these funds are, he will get a set amount through both of these, as the way— He's going to get a fixed amount. Correct, he'll get a fixed amount. Unaffected by what happens with investment or divestment. If it is still solvent, and he has pled that there is, in our pleadings we have listed in the complaint as well as in our responses that these divestment statutes, this one and there's another one which is section 809, are impacting the solvency of the funds. There's needed to be an infusion already and that there have been issues that have been raised as we've cited to whether these funds are stable. I mean the stock market overall has gone down quite a bit over the last, I don't know, couple years. And so I don't know that that necessarily answers anything except, I guess what I'm wondering is this. The state of Texas charges taxes, you know, and so you have property taxes and you have, they don't have income tax, but they have all the other kinds of taxes, sales tax, whatever. So the notion that they don't have money, I mean right now the legislature is dealing with the fact that they have too much money and what do we do with all this money? So the notion that somehow he's not going to be able to get this set amount because they don't invest in a boycotting company, I guess I'm just not seeing that. It seems like that is speculative. So how does that help him gain standing? Your Honor, I would say again if we refer back to Lujan v. Defenders of Wildlife, the requirement there at this stage, at the motion to dismiss stage, is that at the pleading stage a general factual allegation suffices. He doesn't need to have the absolute specifics of the dollar amounts. What he does allege is that he believes that there is harm to it, both that it will cause financial harm, although he's not seeking, again, he's not seeking a specific dollar amount or tied to a particular investment, but both to the way that it's being handled and the financial viability of the funds as well as the constitutional threat, the unconstitutional action of what's being ordered here, which under Craig v. Boren, which is 429 U.S. 190 1976 Supreme Court case, and Mothershed v. Justices of the Superior Court 410 F. 3rd 602, which is a Ninth Circuit case, as well as the village of Schomburg v. Citizens for a Better Environment, which is 444 U.S. 620. Under those cases, he can claim a future injury. Under those cases, those cases speak to the constitutional harm, the constitutional violation as being a harm. In addition, Comstac Corp. v. FCC, this court at 250 F. 3rd 931 recognized that a future injury can be sufficient, that the injury does not have to happen in this moment. But it's a speculative injury is the problem. So I guess, I mean, the notion that the state of Texas shouldn't have this law, I understand people can feel that way, although I'm sure there's people that feel the other way. So I'm sure that the state of Texas has some mixed views on this. But why, you know, so you would agree that just an average person couldn't sue on this, could they? I would agree with that. Okay. So what is it about his situation that changes that, that's not conclusory, that's actually got some, you know, Iqbal facts? Right. It's got some teeth to it. He does identify, again, that he will be retiring. He will be relying on these funds. And the solvency of it and how they are handled does affect him. It does impact, you know, what is directly his. He's got teeth in this. He's got skin in the game for these funds. It's not somebody standing off to the side saying I just don't like the fact that the statute exists. And he's denied, under the statute, he's denied a private direct right of action. Theoretically, the statute tried to preclude even this action from taking place in addition to many other limitations that are contained in there. And the statute addresses divesting. It also addresses not investing in. And the appellee, I believe it's currently 11 companies that are listed, that are on this list as delineated by the comptroller and communicated. On that list of those companies, appellee has pointed out many times and relied heavily on the fact that you can't point to a divestment in any of those. But the statute speaks to divestment and not investing in. And these funds are also not invested in any company that's on that list. So there is harm that is being done right now in that those actions are being required, both in that it's just not a good exercise of the fiduciary duty and fiduciary judgment. And that's being hamstrung by these individuals. But fiduciary duty isn't the constitutional issue. That's not the constitutional issue. So the constitutional issue is, as you say, the sort of the politics of this law. But how that impacts him when it's a state that, as I said, I mean, they can raise the taxes, they can do a lot of ways to make sure that he gets paid his fixed amounts when he's retired. So I'm just struggling with how he can have standing to claim he is injured by this as opposed to, as I said, upset about it. And, you know, as I said, both sides of this issue, I'm sure, have very strong feelings about it. And I respect that. Again, I would say two things to that, Your Honor. First, that under this Court's authority of Bower v. Texas, which again is 341 F3rd 352, he need not wait specifically for the injury, in fact, to be completed as long as he shows that it is likely, as long as he can show that it is possible. And as this Court recognized in Getty v. Mayorkas, which is 16 F4th 456, the comparison on standing to the Lujan standard as both the District Court did and as appellees have done is an apples to oranges comparison here. He can refer to the chilling of free speech. It need not necessarily be his speech, but the chilling of free speech and the chilling of fact that, you know, companies may be afraid to support something they otherwise would have supported because the state of Texas is going to blacklist them, is going to put them on this list, publish it, put it on the, you know, put it up on its website as it is done. I can't speak to whether they have standing or not. I'm just saying that that's a different story. That if a company wants to support this boycotting, but they can't, that isn't for him to sue about. Your Honor, I would say that because of the chilling effect on his free speech rights, that it does not need to be his speech, as is articulated in the Mothershed case and is set forth in our briefs, that he does set forth that it is, again, it's directly traceable, which is further down the road, but traceable to the defendants because of an unconstitutional statute. And he's doing the facial challenge to it. He does have, again, he's not someone sitting on the sidelines. He's not somebody without skin in the game here. He's got dollars directly in it. And he can also bring, as he does his free speech claim, where it doesn't need to be his speech. He can point out that the chilling of free speech doesn't need to be his in order for him to bring that claim, which is what he's doing. We believe that he also has a direct claim, that he can bring it directly, based on the fact that the motivations, the directions that he's being told, that the fiduciaries are being instructed to take, without any legitimate opt-out in the statute, incidentally, are violations that give him standing directly as well. The statute in 808, I do want to address before, while I still have time up here. In 808.002, the statute, the government code, gives the state governmental entity and the comptroller, lists them as they are exempt from any conflicting statutory or common law obligations. It just gives them blanket immunity in 808.002 against anything else that might conflict with this. And we challenge that as well, that they need to be able to be held accountable. As appellees would have it, that appellees would claim that there is no way that anybody can be held accountable. There's no proper defendant here, the way that they argue it. And there's no one who should be held accountable here. But we believe that these are the proper defendants, he is the proper plaintiff, and others like him who have demonstrated their vested interest in it. The only option that a fiduciary has under 808.056 is to ask to cease divesting by showing up to a clear and convincing standard in a report that must be submitted at least every six months to the attorney general, to the comptroller, and to both houses of the legislature exactly what the harm is that would be caused by divesting from a particular company that's listed. There is no section that states that you can choose to invest in if you think that that would help the fund. Well, I mean, there are exceptions. If it's creating the kind of problems that you're thinking could happen, there are some exceptions in the rule, right? And I'm saying those exceptions are without teeth, Your Honor. Those exceptions say that they may do this, but that the fiduciary would have to make the request, ask for permission to divest, and make the request to the comptroller, the attorney general, and both houses of the legislature. And in addition, would have to meet a clear and convincing evidence standard showing where the harm is before being able to divest. That's the way that it's stated. It doesn't state that they're going to grant it. It does state that that would have to be continuously reapplied at least every six months, and again, by a clear and convincing evidence standard before delaying the investment. And it doesn't speak to not investing in. There's nothing that addresses whether the companies, whether the fiduciaries can invest in particular companies that are on this list if they think it's harmful to the fund not to be ordered not to do that. As is happening with 809, which I understand is not in front of this court, but by example, mirrored language in Section 809 where the comptroller right now is saying you're going to have to divest from companies that don't want to use oil. Your time has expired. Thank you very much. I appreciate it. And I will be back for rebuttal. I appreciate your time. Thank you, Your Honor. Thank you, judges. Chief Judge Richman, and may it please the court. Abdullah has no Article III injury because the possibility of him losing any money as a result of Chapter 808 is conjectural and hypothetical, not actual or imminent or certainly impending within the meanings of Lujan and Clapper. To show an Article III injury, Mr. Abdullah would need to plausibly allege that the entire employee's retirement system of Texas and TCDRS will default on their payments because they cannot invest in 11 out of thousands of publicly traded companies, will choose to disregard their fiduciary duties to their plan members by not employing Chapter 808's exceptions to divestment, and that the retirement systems will be unable to pay Abdullah his pension at an unknown point of time. Would it be possible for Texas to, if there's some problem with all the investments, to use tax money or use other money to pay this? Yes, I believe so. This is in the Texas Constitution. I believe it's Article 16, Section 67. There is a provision in there that says if there's an emergency, as stated by the governor, the legislature may appropriate additional sums to ERS. That is also referenced in 808.005, or at least that section of the Texas Constitution is, which also points out that the investors have a duty of care, as an ordinary, reasonably prudent person would. That's also in that same section of the Texas Constitution. Does that support the notion that it would be extremely unlikely for the fixed funds he's supposed to be receiving to go away, even if the investments are not as great as they should be? Yes, I believe so. I think that shows that it would be all the more speculative that the legislature may not provide additional funds to ERS. I think that's another piece, another link in the chain of the speculative injury. But what about his argument that, you know, you all have kind of argued that this is the future, so it's speculative. What about the arguments that your opponent just made about, well, but the future can be a basis for the case? Well, so the Supreme Court in the Tholvy U.S. Bank case held that in a defined benefit payment plan, as long as a defined benefit payment plan member is receiving his money, then he has no Article III injury. And I think another point on that is there's nothing in the complaint that suggests when Mr. Abdullah will retire. So the question is not will ERS default today. The question is will ERS default at a point in the future that we don't know. I also want to be sure to point out that Abdullah will receive fixed amounts of payments when he retires because he is in a defined benefit plan. This is governed in the Texas Government Code by 814105A, which are the factors that ERS uses to calculate retirement benefits. It has to do with highest compensation, a statutorily fixed multiplier, and the number of years of service. And TCDRS's calculation, this is an 845306A sub 1 and 2 of the Government Code, their calculation is based on the amount of contributions that a member like Abdullah would put in and a set 7% statutory compound, 7% compounded interest. So those things have nothing to do with the market performance of the fund. I also alluded to that there are presently 11 of thousands of publicly traded companies on this list. It is, of course, a speculative matter as to whether companies might be removed or whether companies might be added in the future. But what we do know is that the retirement systems are multibillion dollar funds, that there's no allegations that TCDRS has ever divested from anything. There is an allegation that ERS has made one divestment representing less than 1% of its assets. There are no allegations that the companies even want to purchase, or excuse me, that the retirement systems even want to purchase any of these listed companies. And that, I think, is another reason why it is a speculative injury that they would default. I also want to reference the three statutory protections in the statute. The first is at 808005, which says that if the retirement systems believe that divesting would violate their fiduciary duties, then they don't have to divest. That's at 808005. And then there's two others at 808056. The first one says that if there would be a hypothetical loss in the value of assets, if the net value of the funds decreased as a result of divestment, then they don't have to. And the third exception is that if they use benchmark-aware strategies, and these are major institutional investors, if they can't keep up with their benchmarks, then they also don't have to divest. And so this third piece of showing the speculativeness of Abdullah's injury would be that the managers of the retirement systems would choose not to exercise any of those three exceptions, in addition to the Texas constitutional provision I referenced earlier, which says if there's an emergency, the legislature may appropriate more money. And, again, because we don't know when Mr. Abdullah will retire, the question, again, is not will ERS default. Now the question is. Well, let me ask you this. So this is kind of a hypo. If we were to affirm the standing, and so this was dismissed without prejudice because it's a lack of jurisdiction, and then down the road all the things he's predicting happened did somehow happen, would he then be able to sue? Well, I suppose that would be something that might take place many years from now, and I guess I'm not sure. We would have to know what the facts were at that time in the future. But, I mean, this is a dismissal without prejudice because it's a jurisdictional dismissal, and so it does not prevent a future case should things change. Now, obviously, you know, we would have an opinion, and that opinion would cover the situation. So I'm not saying he could file again tomorrow or something, but I'm just saying way down the road that could happen, right? Perhaps if there were a situation when he actually retired and nobody was exercising any of the statutory exceptions and the ERS was about to default and the legislature was doing nothing about it, if all of those things happened at some point at the time he retires and we don't know when that is, then maybe. The question, of course, would be is it certainly impending and is it not conjectural or hypothetical, and I suppose we would need to know what the facts were at that point in time, and there would be a lot that would have to change between now and then. I also want to be sure to briefly address the sovereign immunity argument because it overlaps significantly with the standing argument. There are two essential prongs to the Ex parte Young analysis, suing a proper defendant and seeking a proper form of relief, and I want to focus on the first of that, suing a proper defendant, which in itself has two prongs, the first being that someone has to have, meaning the state officer, has to have the specific authority to enforce and the second being that he has taken some type of step to enforce it. And the reason why there is sovereign immunity as to both the comptroller and the attorney general is because as to that first prong, the comptroller doesn't have the authority to engage in compulsion or constraint vis-a-vis either Abdullah or the retirement systems because he promulgates the list and he sends it and he distributes the list, but he can't make divestment decisions. In other words, there's those three statutory exceptions and the comptroller isn't the one that gets to make the decision as to those three statutory exceptions. As to the attorney general, the attorney general has the discretionary authority, this is 80102 of the statute, to enforce it, but there are no allegations at all in the complaint about any steps that he has taken, such as compulsion or constraint, demonstrated willingness, a step of affirmative action. None of that is in the complaint. So, I mean, if he had standing, who could he sue? Well... It's not the attorney general who's the one with the authority to... As the Court alluded to earlier, it may be a situation where a retirement system might have to bring the suit. This is also somewhat analogous to the Supreme Court's Valley Forge case, the idea that just because this one plaintiff doesn't have standing and might be the only one that could have standing is not in itself a reason to find standing because the requirement of Article III is to resolve cases and controversies, not every abstract constitutional question. Well, as regards to the attorney general, you didn't raise sovereign immunity until you were on appeal. Correct, and sovereign immunity is jurisdictional in this Court. So you can't waive it. Is that what you're saying? You can't waive it by not raising it, whether you raise it or not. Sovereign immunity is jurisdictional, and for that reason it may be raised for the first time on appeal. But sovereign immunity is waivable. Well, I think there might be a distinction between waive and forfeit. We certainly did not affirmatively waive it below, and because it is jurisdictional, it can't be forfeited. It was raised on behalf of the comptroller but then not on behalf of the attorney general, so it was on somebody's radar. That's correct. It was raised on behalf of the comptroller below but not on behalf of the attorney general. But because it goes to the Court's jurisdiction, our view is it can be raised for the first time on appeal, and this Court has entertained sovereign immunity arguments in the past that were raised for the first time on appeal. But the Court, of course, need not reach the issue of sovereign immunity. It may simply decide the case on standing, and I want to make a couple other points in the vein of standing. Mr. Abdullah referenced the Mothershed case. I want to be clear about the Mothershed case. Both that case and this Court's holding in Seals v. McBee explains that the First Amendment overbreadth doctrine in no way alters the Article III injury requirement, and additionally, as to the free speech claims, the overbreadth doctrine does not alter the Article III injury requirement. So if Mr. Abdullah says that the speech of others is being chilled by this statute, he himself still has to have some type of Article III injury, and here he's alleged it's not. He specifically said it's not his own speech, so it has to be his own. I mean, there's nothing to prevent him from advocating for the side that would like to boycott and advocating against the country that the statute governs not boycotting and so on, right? There's nothing to stop him from that. In court, of course, he would have to have an Article III injury. No, I'm talking about in life. Can he go out and say, I don't like this country, I like these people? Of course. Okay, so there's nothing stopping him by this statute from doing that. Of course. There's nothing stopping him from boycotting companies that are investing widely in that country. Of course. Nothing about Chapter 8 of the Government Code infringes on his ability to Because you were talking about the speeches of others, and so I'm talking about his speech. He is allowed to write a letter to the editor, go online, say all the things he wants to say negatively about that country if he so chooses. Yes, there's nothing in Chapter 808 of the Government Code that in any way prevents him from engaging in any form of political advocacy that he wishes on this issue. And if there are no further questions, we ask that the judgment be affirmed. Your Honor, so I'd like to begin by addressing the sovereign immunity issue specifically, first of all, as to the Attorney General. Counsel for the Attorney General stood in front of this court on November 7th in 2022 in the A&R engineering case and stated that by analogy, by contrast, in a case that was discussing Texas Government Code 2271, stated more than once in oral argument in that matter that the Attorney General is specifically charged with enforcement duties under Section 808 and that the Attorney General would be covered under Section 808, but by contrast in the section that was applicable to the A&R engineering case, which is Section 2271, different section of the statute, the counsel then claimed that that same language did not occur in that section, so for the case before it, that it was not an issue. I will also point out that under the City of Austin v. Paxton, which is 943 F. 3rd 993, as well as this court's ruling in Mi Familia Vota v. Abbott, which is 977 F. 3rd 461, the statute does not need to specifically articulate that the individual be charged with this duty, although it does as to the Attorney General, and the Attorney General is specifically charged with having enforcement rights under 808.102. As to the comptroller, the comptroller need not be specifically named, as addressed, again, in the cases that I cited for City of Austin v. Paxton and Mi Familia. Ex parte Young does not require that the official be specifically named. It just requires that there be some connection, and there is more than some connection to the comptroller who creates the list, posts the list, communicates it to the funds, requires that the funds act upon it, and then the Attorney General stands back with the ability to bring any action necessary to enforce this chapter. What the government is asking here is that you believe that Texas has issued itself a sword, is able to hold it, is able to show it off, is able to point out how sharp it is, but until they actually use it, they don't need to be held accountable for it. It's not a problem that they have the sword. It's not a problem that they can't. And it doesn't matter how many names are on that list, incidentally. It could be one or it could be a million. There is harm. Going back to what my colleague across the aisle had said regarding the exceptions that are contained within the statute, again, I will point to the fact that 808.002 says none of those apply. It says none of those duties apply. 808.002 specifically says that state governmental entities and the comptroller are exempt from any conflicting statutory or common law obligations, including any obligation with respect to making investments and goes on with more detail as to naming the companies, anything like that. So they specifically give themselves blanket immunity, saying that they don't have to abide by fiduciary duties. The fact that there is a permissive language exception contained in 0.056A, it's got strings attached, a lot of them. It's not clear. And, again, in 0.054, shall divest and may delay. They're told that they shall divest. They have to divest. But then for the exception, it says that they may delay divestment, not divest, but they may delay divestment if they do all these things and jump through the right hoops and present it accurately. So with the time that I have left, I do want to point out we believe that Hasib Abdullah is a proper plaintiff here because of his personal interest in his own funds, because of the constitutional harm and the facial challenge to the constitutionality of this statute. The government has pointed out in its own motion to dismiss, which was document 26 at the lower court and cited in our briefs and at page 6 of that, that the attorney general is specifically enumerated and stood before this court on November 7th of 2022, arguing that unlike the statute being discussed that day, Section 808 of the government code does specifically charge the attorney general with enforcement powers. Thank you, Your Honors. I appreciate your time.